UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- versus -<br><br>BHUNNA WIN,<br>                           Defendant. | 17-CR-107-11 (DWF/TNL) |

**DEFENDANT BHUNNA WIN'S MEMORANDUM OF LAW
IN SUPPORT OF HER MOTION TO SEVER**

Bhunna Win respectfully submits this memorandum of law in support of her motion to sever her trial from that of her co-defendants.   Ms. Win is charged with conspiracy and substantive charges of money laundering, as well as a charge of operating an unlicensed money transmitting business.   In addition to money laundering charges, her co-defendants are separately charged with conspiracy and substantive charges of sex trafficking through force, fraud and coercion, conspiracy to commit transportation to engage in prostitution, and conspiracy to use a communication facility to promote prostitution.   The indictment outlines conduct by Ms. Win's co-defendants that -- if proved at trial -- will overwhelm the jurors' capacities to compartmentalize the evidence and evaluate the case against Ms. Win on its own merits.   As such, severance is appropriate.

### FACTS

#### A.    Bhunna Win

Ms. Win, aged 50, is the single mother of three children, two in college, and one (aged 14) in high school.   She resides in San Diego, California, with her youngest child.   She is a lawful permanent resident.   Until her arrest in this case, she worked for five years as a food service professional at a local school.   She has no prior criminal history.

#### B.    Gravaman of Indictment Against Ms. Win's Co-defendants

The Superseding Indictment [ECF830], filed on July 18, 2018, alleges a large-scale international sex trafficking organization, which "trafficked hundreds of women from Bangkok, Thailand, to various cities across the United States," recruiting them with "promises of a better life in the United States," and engaging in "widespread visa fraud in order to transport the victims to the United States."   Indictment, ¶ 2.   Once in the United States:

> the criminal organization sent the victims to "houses of
> prostitution" located in cities across the country. There, the victims

> were forced to work long hours-often all day, every day-having sex
> with strangers in order to attempt to pay down their bondage debts.
> The victims were isolated. They typically did not have the ability
> to choose who they have sex with, what sex transactions they
> would engage in, or when they would have sex.  Until they paid off
> their exorbitant bondage debts-often between $40,000 and
> $60,000-the victims were effectively "owned" by the organization.

*Id.*, ¶ 3.

Co-defendants  Pawinee Unpradit and Waralee Wanless are alleged to have been

"traffickers," the individuals "to whom the victims of sex trafficking owed some or all of their

bondage debts."  *Id.*, ¶5(a).  Co-defendants Michael Morris, Saowapha Thinram, Gregory

Kimmy and Thoucharin Rttanamongkongul are alleged to have been "house bosses," the

individuals who "ran the day to day operations at the houses of prostitution, which included

advertising the trafficking victims for commercial sex acts (or "dates"), procuring and

maintaining the houses of prostitution, scheduling sex buyers (or "Johns"), and ensuring that a

portion of the cash (typically 60%) made by the victims was routed back to the boss/trafficker to

pay down the bondage debts."  *Id.*, ¶5(b).

The Indictment alleges that acts of force, threats of force, fraud and coercion of women

at the alleged houses of prostitution, including dramatically changed "contracts" once they

started working.

> For instance, if a victim was paid $180 from a commercial sex
> transaction, only a portion of that money (approximately $100)
> would go to pay down her bondage debt.  The rest of the profits
> ($80) were paid to the "house boss," and a victim was allowed to
> keep little to none of the money she made engaging in commercial
> sex acts.  Additionally, victims were often charged for all manner
> of things, such as housing, travel, or even food, such that the
> ability to pay down the bondage debt was further reduced.

*Id.*, ¶ 15.

Traffickers are alleged to have turn "controlling, manipulative, threatening and violent," once the women entered the United States. *Id.*, ¶ 16.

> The traffickers enforced the terms of the bondage debts through means of force, threats of force, fraud, and coercion, including abuse of legal process (such as threats to alert immigration officials) and threats of deportation. As a part of obtaining visa documents, members of the criminal conspiracy gathered personal information from the victims, including the location of the victims' families in Thailand. In the event that a victim became non-compliant or escaped the organization once in the United States, traffickers used this information to threaten the victim and/or her family and compel a victim to continue working or return to work.

*Id.*

Life in the houses of prostitution is described in the Indictment as follows:

> The criminal organization also controlled the victims by isolating them from the outside world. During the period of the bondage debts, the victims, who often spoke little to no English and were illegally present in the United States, lived in the houses of prostitution. They did not have control over their movements and were typically only allowed to leave the prostitution houses if they were accompanied by "runners," often "clients" of the organization who were compensated, in part, through sex with the victims. The victims were not allowed to decline commercial sex buyers who were physically or sexually abusive or otherwise unwanted. The victims were advertised for commercial sex transactions in any number of ways, including in online escort ads on websites such as backpage.com and eros.com. The victims were expected to have sex with numerous men-up to ten or more "Johns"- in a given day. At times, customers would be physically and sexually abusive with the victims, including acting out "rape fantasies" with the victims.

*Id.*, ¶ 17.

**C.     Gravaman of Indictment Against Bhunna Win**

Ms. Win is not charged with conspiracy or substantive counts of forced sex trafficking, or conspiracy to transport for purposes of engaging in prostitution, or conspiracy to use a communication facility to promote prostitution.  Rather, she is charged with counts related to

money laundering and money transmitting. The money laundering aspect of the alleged

trafficking organization is described in the indictment as follows:

> Specifically, these money launderers made their bank accounts
> available and coordinated the deposit of cash generated from the
> commercial sex trafficking into accounts they controlled and then
> coordinated subsequent withdrawals as well as other transfers of
> funds, including in amounts greater than $10,000, generally  and
> in  an  effort  to conceal the source of the funds, to avoid reporting
> requirements, and to promote the commercial sex operation.  The
> money launderers also coordinated the  procurement and
> movement of money in and back to Thailand as payment for the
> bondage debts owed by the trafficking victims, to promote the
> continued operation of the commercial sex trafficking
> organization, to conceal the proceeds from the sex trafficking
> operation, and to avoid reporting requirements.

*Id.*, ¶ 5(c).

### D.    The Migrant Remittance Industry

As the World Bank has documented, the number of migrants has risen rapidly in recent

years, due to labor shortages, internal conflict and way, natural disasters, climate change and

improved access to information through phone and the Internet.[1]  These migrants send earnings

back to their families in developing countries at huge levels - "above US$441 billion, a figure

three times the volume of official aid flows."[2]  As the World Bank explains, "[t]hese inflows of

cash constitute more than 10 percent of GDP in some 25 developing countries and lead to

increased investments in health, education, and small businesses in various communities."[3]  The

United States was the largest remittance source country, with an estimated $56 billion in

outward flows in 2014.[4]

---

[1] *See* Migration and Remittances Factbook 2016 at vii (World Bank, 2016), available at
https://openknowledge.worldbank.org/bitstream/handle/10986/23743/9781464803192.pdf?sequence=3&is
[2] *Id.*
[3] *Id.*
[4] *See* World Bank Press Release, *International Migration at All-Time High*, December 18, 2015, available at
http://www.worldbank.org/en/news/press-release/2015/12/18/international-migrants-and-remittances-
*(footnote continued)*

One researcher, Dilip Ratha, explains the impact of migrant remittances as follows:

> At more than three times the size of development aid, international migrants' remittances provide a lifeline for millions of households in developing countries.  In addition, migrants hold more than $500 billion in annual savings. Together, remittances and migrant savings offer a substantial source of financing for development projects that can improve lives and livelihoods in developing countries."[5]

University of Minnesota professor Paul Vaaler adds:

> Perhaps most importantly . . . immigrants and their remittances enhance the development of vital entrepreneurial building blocks in immigrants' home countries.  Remittances are directly associated with enhanced availability of capital to invest in new businesses, with enhanced rates of new business start-ups (unless crowded out by the state), and with enhanced internationalization of the broader economy. Far from remittances serving merely as subsistence assistance to desperately poor, sick and/or uneducated family and friends, I find evidence that they serve as a critical source of money and ideas for developing-country entrepreneurs. If this is true, then developing-country immigrants also play roles as transnational venture investors, firm founders and agents of business expansion in a context where other players are reluctant to act.[6]

### E.    The "Hawala" System

As Professor Vaaler explains, remittances flow from individuals in host countries to home countries through either standard commercial conduits (money transfer organizations such as Western Union, banks and post offices), or alternative conduits -- "as simple as individuals carrying cash across borders, as well as more sophisticated debt-transfer practices based on hawala principles in classical Islamic law."[7]  Approximately 60% of remittances in 2009 were

---

continue-to-grow-as-people-search-for-better-opportunities-new-report-finds ("World Bank Press Release").

[5] *Id.*

[6] Paul M. Vaaler, *Immigrant Remittances and the Venture Investment Environment of Developing Countries*, Journal of International Business Studies, July 2011, at 23.

[7] *Id.* at 3.

through commercial conduits.[8]  In other words, approximately 40% of the estimated $600

billion migrant remittances annually[9] are conducted through alternative conduits like the hawala

system, which Ms. Win is alleged to have used.

The hawala system is a form of money transfer that occurs in the absence of, or is

parallel to, formal banking sector channels.

As the Indictment describes it:

> The hawala system for moving money is based on trust and family
> association and typically involves the payment of money, via cash
> or other method, to an agent in one location who then instructs an
> associate in another location, often in another country, to pay the
> final recipient. The two intermediaries typically work together on
> an ongoing basis, each receiving and disbursing funds to and from
> individuals or accounts in his or her own location, and reconciling
> these credits/debits with the other intermediaries as necessary. The
> result is the movement of funds from one location to another
> without the need to actually transfer or wire the funds. This
> criminal organization moved millions of dollars in illegal proceeds
> generated from the sex trafficking scheme from the United States
> to Thailand and elsewhere outside the United States using this
> hawala-based system.

Indictment, ¶ 19(d).

Developed in India, it is "currently a major remittance system used around the world."[10]

Although often referred to as "underground banking," in fact, hawala dealers "often operate in

the open with complete legitimacy, and these services are often heavily and effectively

advertised."[11]  The key component of hawala, and what distinguishes it from other remittance

mechanisms, is "trust and the extensive use of connections such as family relationships or

---

[8] *Id.*, citing presentation materials from Moneygram International.
[9] *See* Press Release (estimating that migrant remittances in 2016 would exceed $600 billion).
[10] Patrick M. Josh, *The Hawala Alternative Remittance System and its Role in Money Laundering*, FinCEN,
    January 2000, at 5, available at http://www.nmta.us/assets/docs/hawala.pdf.
[11] *Id.*

regional affiliations."[12]  As such, hawala involves minimal or no use of any sort negotiable

instrument.[13]  Its attractions include its cost effectiveness (usually much cheaper than traditional

commercial conduits), its efficiency (can take place in one to two days), its reliability (banking

systems in developing countries can prove unreliable), and aspects that encourage its use for

illicit transfers, such as its lack of bureaucracy, lack of a paper trail and lack of scrutiny.[14]

## F.     The Massage Industry

In addition to allegedly transmitting proceeds from restaurant businesses located in the

United States to destinations overseas, Ms. Win is also alleged to have transferred proceeds

from massage parlors.  Massage is one of the world's oldest health treatments - Hippocrates

noted its benefits in his writings.[15]  It grew in popularity in the U.S. in the latter half of the

twentieth century, in part because of its successful use by athletes.  Massage education and

training are now offered in about 1,000 private training schools, and a growing number of

community colleges also offer accredited courses in massage.[16]  The first national organization

of massage therapists, the American Massage Therapy Association (AMTA), was founded in

1943, and it is now the largest such association in the world, with more than 58,000 members.[17]

To gain further acceptance by the medical community and the public, a system of national

certification was established in 1992.[18]  To become certified by the National Certification Board

---

[12] *Id.*
[13] *Id.*
[14] *Id.* at 9.
[15] Thornton & Timmons, *Licensing One of the World's Oldest Professions: Massage*, 56 Journal of Law and
     Economics 371, 372 (May 2013).
[16] *Id.* at 373.
[17] *Id.*
[18] *Id.* at 374.

for Therapeutic Massage and Bodywork (NCBTMB), applicants must complete 500 hours of in-class training at an  NCBTMB-approved school of massage and pass a written examination.[19]

The massage parlor business has grown at a huge pace in recent years.  Research estimates that massage therapy was a $16 billion industry in the country in 2017.[20]  Current estimates put the number of massage therapists and massage school students in the United States at between 335,000 to 385,000.[21]  Between July 2016 and July 2017, surveys indicate that roughly 47.1 – 59.5 million adult Americans (19 - 24 percent) had a massage at least once.[22]  Today's massage therapists are predominantly female (89 percent); at a median age of 46 years old; most likely to be members of a professional organization; most likely to be sole practitioners; charging an average of $72.13 for one hour of massage; and likely to provide massage therapy in a number of settings, including client's home/office, spa/salon, their own office, a health care setting, health club/athletic facility, or massage therapy only franchise or chain.[23]

Currently, 46 states and the District of Columbia regulate massage therapists or provide voluntary state certification.[24]  In states (like California) that regulate massage therapy, massage therapists must meet the legal requirements to practice, which typically include minimum hours of initial training and passing an exam.[25]  In California, for example, prospective massage therapists must obtain licensure after graduating from an accredited training program (the NCMTMB or the one run by the Federation of State Boards of Massage Therapy, and before

---

[19] *Id.*
[20] Amerian Massage Therapy Association Industry Fact Sheet, available at
https://www.amtamassage.org/infocenter/economic_industry-fact-sheet.html.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*

beginning to work as a massage therapist.[26]  The median annual Massage Therapist salary in Los Angeles, CA is $55,126, as of June 29, 2018, with a range usually between $49,333-$63,332 not including bonus and benefit information and other factors that impact base pay.[27]

### G.    Evidence of Ms. Win's Knowledge of Illegal or Forced Sex Trafficking

Ms. Win does not know, has never met and has never ever had any communications with any of her co-defendants scheduled for trial in November 2018.  She is not alleged to have run a brothel, or played any role in recruiting, arranging transportation for, employing or even communicating with any of the women allegedly trafficked through the organization described in the indictment.  Her only contacts in the alleged "trafficking organization" were with two co-defendants who pled: Natchanok Yuvasuta and Nattaya Leelarungrayab.  A review of discovery provided by the government reveals that these two individuals ran successful massage parlors in in Los Angeles.  Their parlors were located in up-scale, family-friendly neighborhoods and were fully licensed and in compliance with all relevant regulatory requirements.

Leelarungrayab first worked in the restaurant business when she arrived in the United States, and then opened her own massage parlor.  She stated that she started moving money to Thailand for others in 2010.  She would utilize various individuals to transfer the money for her, including Ms. Win, who she met through a friend who was a cousin of Ms. Win's.  She stated that Ms. Win would advise her of the account into which cash could be deposited and the applicable exchange rate into Thai Baht.  Ms. Win occasionally told Leelarungrayab not to deposit large amounts in the bank accounts so as not to attract attention from bank officials.

---

[26] Guide available from MassageTherapyLicense.Org, available at
https://www.massagetherapylicense.org/state/california-massage-certification.html.
[27] Information obtained from this website: https://www1.salary.com/CA/Los-Angeles/massage-therapist-Salary.html.

Yuvasuta stated that she started moving money to Thailand for others in 2005. Leelarungrayab introduced Yuvasuta to Ms. Win.  She explained that Ms. Win would advise her which accounts into which she could deposit the money.  The amounts would be between $5,000 and $10,000 each deposit.  Yuvasuta would charge between $10 and $15 per $1,000 of remittance, and she understood that Ms. Win would make money for herself through the exchange rate.  Yuvasuta knew that some of the money she was moving came from brothels, but people gave her different stories (selling coffee, selling things on the internet).  She also admitted that the masseuses in her massage parlor would engage in sexual contact with customers, either in a separate room or through "outcalls" to locations outside the parlor. Customers for the money transfer business were referred to her by word of mouth.

At no point in their proffer statements did Yuvasuta or Leelarungrayab state that they had informed Ms. Win of the source of any of the monies they were moving.  In fact, in one proffer, Yuvasuta stated that she did not know the source of the funds provided to her, although she suspected that some came from prostitution or was designed to evade taxes.

REDACTED

**ARGUMENT**

**MS. WIN'S TRIAL SHOULD BE SEVERED TO AVOID
PREJUDICIAL SPILLOVER OF EVIDENCE ADMITTED
AGAINST HER CO-DEFENDANTS**

A.      Principles Applicable to a Severance Motion Pursuant to
         Fed.R.Crim.P. 14(a)

Joinder is permitted if the defendants are "alleged to have participated in the same act or

transaction, or in the same series of acts or transactions, constituting an offense or offenses."

Fed. R. Crim. P. 8(b).  However, if joinder "appears to prejudice a defendant or the government,

the court may order separate trials of counts, sever the defendants' trials, or provide any other

relief that justice requires." Fed. R. Crim. P. 14(a).

While the law favors joint trials for defendants charged in the same indictment,

severance should be granted:

> if there is a serious risk that a joint trial would compromise a
> specific trial right of one of the defendants, or prevent the jury
> from making a reliable judgment about guilt or innocence. Such a
> risk might occur when evidence that the jury should not consider
> against a defendant and that would not be admissible if a defendant
> were tried alone is admitted against a codefendant. For example,
> evidence of a codefendant's wrongdoing in some circumstances
> erroneously could lead a jury to conclude that a defendant was
> guilty. When many defendants are tried together in a complex case
> and they have markedly different degrees of culpability, the risk of
> prejudice is heightened.

*Zafiro v. United States*, 506 U.S. 534, 539 (1993) (internal citations omitted).  "A defendant can

demonstrate real prejudice to his right to a fair trial by showing (a) his defense is irreconcilable

with that of his co-defendant or (b) *the jury will be unable to compartmentalize the evidence as

it relates to the separate defendants.*" *United States v. Washington*, 318 F.3d 845, 858 (8th Cir.

2003) (emphasis added); *see also United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006)

("[p]rejudice can be demonstrated by showing that the jury will be unable to compartmentalize

11

the evidence as it relates to the separate defendants because of a 'prejudicial spillover effect'")
(quotation omitted).

> B.  The Jury Will Be Unable to Compartmentalize the Evidence
> Related to the Alleged Sex Trafficking Conduct of Ms. Win's
> Co-Defendants

This is precisely the case for which the severance process was envisaged.  Ms. Win's
role in this case, as outlined in the indictment, was as a trusted money transmitter in a hawala
system - a common system of international migrant remittances that moves billions of dollars
overseas annually.  Ms. Win is not charged with sex trafficking, and indeed, nowhere in the
discovery or grand jury is there any evidence that she knew the individuals sending her money
were involved in trafficking women for prostitution, running brothels or otherwise engaged in
the provision of commercial sex.  Rather, the evidence reveals that she was told the money
came from massage parlors (a $16 billion-dollar industry in the United States, subject to
extensive licensing and regulation) and restaurants.

Ms. Win's co-defendants, on the other hand, are charged with participation in sex
trafficking, including a litany of alleged conduct related to forced sex trafficking, including
"controlling, manipulative, threatening and violent" behavior, threats to alert immigration
officials and threats of deportation if women did not pay their alleged "bondage debt," threats to
"the victim and/or her family" to "compel a victim to continue working or to return to work,"
isolation of the female sex workers, and refusal of their requests to decline a customer who was
physically or sexually violent.  Indictment, ¶¶ 16, 17.  The prejudice to Ms. Win from this
evidence is manifest.  This is precisely the situation where the jury "will be unable to
compartmentalize the evidence as it relates to [Ms. Win] because of a 'prejudicial spillover
effect.'" *Hively*, 437 F.3d at 765.  While some evidence as to the origins of the money allegedly
transmitted by Ms. Win would be admissible at a separate trial, the entirety of the evidence

admissible against her co-defendants will not, under the district court's gatekeeping role to ensure that evidence admitted at trial is both probative and not unduly prejudicial.  *See* Fed.R.Evid. 403.  Moreover, this is not a situation where limiting instructions will suffice.  The wealth of negative evidence relating to Ms. Win's co-defendants recounted in the indictment will overwhelm the evidence as to Ms. Win's alleged money transmitting activities, and thus present the substantial risk that she be convicted merely by association.

<u>CONCLUSION</u>

For the foregoing reasons, Ms. Win respectfully requests that her motion to sever be granted.

Dated: July 27, 2018                         MURRAY LAW, LLC

By:  <u>*s/JaneAnne Murray*</u>
JaneAnne Murray, #384887
The Flour Exchange Building
310 Fourth Avenue South, #5010
Minneapolis, Minnesota 55415
Telephone: (612) 339-5160
jm@mlawllc.com

**ATTORNEY FOR BHUNNA WIN**