UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-107-11 (DWF/TNL)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

BHUNNA WIN,
a/k/a Bhunna Siriangkhunwanish,
a/k/a J'Yung,

        Defendant.

**GOVERNMENT'S SENTENCING POSITION**

The United States, through its attorneys Erica H. MacDonald, United States Attorney for the District of Minnesota, and Assistant United States Attorneys Laura M. Provinzino and Melinda A. Williams, hereby moves the Court for a sentence that accounts for Bhunna Win's serious criminal activity and one that is consistent with that of her co-defendants. To that end, the government is requesting a sentence at or around 22 months of incarceration.

### I.    Factual and Procedural Background

From 2009 until 2017, a large scale international sex trafficking organization trafficked hundreds of women from Thailand to the United States by means of force, threats of force, fraud, and coercion, including through the use of overwhelming and manipulated bondage debts. The victims were trafficked from Thailand to houses of prostitution located in cities across the United States, including in the Twin Cities metro area. There, the victims were forced to engage in near-constant commercial sex acts for the financial benefit of the criminal enterprise. Until they paid off their

exorbitant and fraudulent bondage debts—often between $40,000 and $60,000—the victims were effectively "owned" by the organization.

The criminal conspiracy was organized and hierarchical, with different members of the conspiracy serving in different roles, but all working together to achieve the same ends—to coordinate the movement of the women from Thailand to houses of prostitution across the United States, to cause the women to engage in commercial sex acts at those locations, and to launder the cash profits.

Traffickers in Thailand (the initial holders of the bondage debts) recruited the victims, engaged in fraud to obtain visas for the victims, and arranged for the victims to travel to the United States. The traffickers sometimes retained the bondage debts and collected the debts themselves, with the assistance of other members of the conspiracy. At other times, the traffickers "sold" the victim to conspiracy members in the United States, who then themselves became "ma-tac," owning victims in the organization.

Once in the United States, the victims were sent to houses of prostitution in cities across the country, including Minneapolis. These houses of prostitution were often high-end apartment buildings but could also be down-market "spas." There, the victims were made to engage in commercial sex—up to ten or more customers a day—for the financial benefit of the organization. Only approximately 60% of what the victims earned went to pay down their bondage debts. The remaining 40% of the cash proceeds went to the individuals who "owned" the houses of prostitution, known as "house bosses." The house bosses were responsible for running the day-to-day

operations of the houses of prostitution, including procuring and maintaining the houses, transporting the victims, advertising the victims for commercial sex acts, and scheduling the commercial sex acts with the sex buyers.

The organization also included "runners and facilitators." These individuals—often sex buyers themselves—assisted the organization by renting high-end apartments to serve as houses of prostitution, transporting the victims, including to and from the airport and to the bank for money laundering purposes, and entering into fraudulent marriages with high-level members of the criminal conspiracy.

Finally, there were the money launderers.  Money launderers in the United States, primarily centered in Los Angeles, moved substantial sums of money for the criminal organization.  Commercial sex buyers would pay in cash.  That cash was deposited at banks across the country, where the houses of prostitution were located. Money launderers would route that money through "funnel" accounts to a centralized location, typically in California, and then further move the profits from the commercial sex activity to Thailand using a "hawala"-type transfer system.

In a series of two takedowns—first in October 2016 and again in May 2017—a large chunk of the organization was arrested, having been charged by indictment in the District of Minnesota with conspiracies to commit sex trafficking, transportation to engage in prostitution, money laundering, and related offenses.  While virtually all members of the conspiracy engaged in money laundering at some level, of those arrested, 10 individuals—Ms. Win and co-defendants Thipboonngam, Sukprasert, Chalermsakulrat, Leelarangrayab, Yuvasuta, Guntetong, Ghettalae, and Patrath

(the *Morris* indictment), and Lerslurchachai (the *Intarathong* indictment)—were "professional" money launderers. That is, they were in the business of using highly sophisticated means to launder the cash generated by the organization. While some of the money launderers (notably Thipboonngam, Yuvasuta, Patrath, and Lerslurchachai) were directly involved in the sex trafficking, all of the money launderers were critical in supporting the conspiracy by concealing and moving the cash profits from the criminal activities.

Ms. Win was essential to the success of the criminal organization, but she played an arm's length role. She was involved with the organization from roughly 2014 through her arrest in May 2017. Through her connection to co-defendants Nattaya Leelarangrayab and Natchanok Yuvasuta, Ms. Win became an important money launderer for the organization working out of the San Diego area. Ms. Win assisted in getting the illicit proceeds from the commercial sex acts back to Thailand through sophisticated trade-based money laundering. Ms. Win also ran an informal money transfer scheme more commonly known as a hawala. In such a system, money transfers happen without money movement. Ms. Win would use the U.S. currency to promote her U.S.-based shipping business and instruct associates in Thailand to transfer the equivalent in Thai baht into the designated foreign bank accounts.

As a money launderer, Ms. Win moved the illegal proceeds of the criminal organization from the United States to Thailand. This included payments to traffickers of the victims' bondage debts. The money generated from commercial sex

acts represented the life's blood of the organization—without a way to launder and move the cash proceeds, the organization couldn't function.

Ms. Win, while not pleading to money laundering, was effectively a secondary money launderer, principally laundering money from co-defendants Leelarangrayab and Yuvasuta. The women who Ms. Win moved money for ran massage parlors in Los Angeles where commercial sex acts occurred. Leelarangrayab worked for and then alongside Yuvasuta in her money laundering operation, which was significant and long-running. Notably, although the entire organization was well-aware of the October 4, 2016 first-round takedown and indictment of seventeen defendants, Leelarangrayab and Yuvasuta continued their money laundering efforts on behalf of the trafficking organization. That included continuing to move money through Ms. Win.

The government's review of bank records show that Ms. Win laundered more than $700,000 in cash through her company Excel Intertrade, which she started in 2007 and ran out of her house. Ms. Win admitted at her guilty plea that she ran an unlicensed money transmitting business that affected interstate and foreign commerce and did not comply with registration requirements. Doc. No. 866 at 2.

Ms. Win was part of the second-round indictment and was arrested in California on May 24, 2017. She has been on pretrial release and compliant with conditions of release since June 30, 2017.

As is detailed in the PSR, Ms. Win was born in Thailand in a small town near the border with the country now known as Myanmar. PSR ¶ 22. Ms. Win's parents

ran an auto parts store. They worked hard—a work ethic that Ms. Win has seemed to adopt—and Ms. Win was often cared for by her grandmother. Ms. Win's mother suffered a serious injury in a car accident and never seemed to recover. Ms. Win then left to live in Bangkok with an aunt where she attended school. Ms. Win successfully graduated from high school and college with a business degree. Afterward, she returned to her home village and worked for her family's auto parts business.

Ms. Win married a Burmese man. They have three children who were born in the United States and have had every opportunity to succeed in this country—including participation in music lessons, sports, and all that their schools had to offer. Ms. Win, however, has remained a lawful permanent resident status and acknowledged in the plea agreement that a conviction in the case may impact her immigration status. While Ms. Win's relationship with her husband has been far from ideal, she has not wanted for money. And as evidenced by her sophisticated money laundering operations, Ms. Win is an intelligent and highly capable woman.

## II.   The Plea and Sentencing Guidelines

On September 13, 2018, the defendant pled guilty to running an unlicensed money transmitting business. Doc. No. 866. Ms. Win was the only defendant given the opportunity to do so.

The government believes that the PSR correctly calculated the defendant's advisory guidelines range for her conviction and is consistent with the calculation in the parties' plea agreement. With a total adjusted offense level of 23 and criminal history category of I, the resulting advisory sentencing range is 46 to 57 months in

prison. PSR ¶ 128. The offense of running an unlicensed money remitting business carries a maximum of 60 months in prison.

### III.    Sentencing Recommendation

As with many of the defendants in this case, the matter of an appropriate sentence for Ms. Win is not straight-forward.

In determining an appropriate sentence, the Court is instructed to impose a sentence sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense; the history of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to afford adequate deterrence to criminal conduct; the need to protect the public from further criminal conduct; the need to provide the defendant with corrective treatment; the need to avoid unwarranted sentence disparities; and the need to provide restitution to victims.

The seriousness of the offense and need to promote respect for the law weigh in favor of a significant sentence—one within the advisory guidelines range. As this Court knows and observed from the testimony of many victims at trial, the threats, fear, intimidation, and coercion used by the sex trafficking organization were extreme. And this was a cash organization. Money was its life's blood. And the money needed to move. It needed to travel from the commercial sex buyers to the house bosses and victims. And then further, from the houses of prostitution located across the United States—including in Minnesota—back to Thailand, to pay the

bondage debts of the victims. So, while Ms. Win and others like her did not directly participate in the sex trafficking, they were as essential to it as anyone. The money was the motive. And without it, the whole organization would have come crashing down. Indeed, in charging many of the money launderers in the second-round takedown, the government not only sought to hold accountable those like Ms. Win who would engage in criminal activities, but in so doing, to dismantle the sophisticated money laundering network that allowed this organization to flourish, undetected, for so long.

That said, the Court should credit Ms. Win for her cooperation in helping the government recover money for restitution to the victims. At the time of her plea, Ms. Win agreed to forfeit all the accounts the government identified and seized along with U.S. currency, personal jewelry, and digital devices. Doc. No. 866 at 8–9. The defendant tendered a cashier's check in the amount of $525,000 at the time of her plea. In total, Ms. Win has already repaid the $749,283.97 she transmitted for the organization. The government will recommend that the Money Laundering and Asset Recovery Section of the Department of Justice apply the money forfeited to the restitution judgment against the defendant. This will go a long way toward helping the women the organization victimized—women far less fortunate than Ms. Win. Of no small matter, Ms. Win also helped the government to further understand the money laundering operations of the organization. Hopefully this will allow law enforcement to better detect and dismantle other sophisticated money launderers and commercial sex trafficking enterprises that profit off human suffering.

Further, Ms. Win took responsibility for her conduct with a guilty plea. It appeared to the government, for a while, that Ms. Win may be the sixth defendant sitting at counsel table during a trial. The defendant's acceptance of responsibility saved the government resources and caused less harm to the victims. Together with her plea and with Ms. Win's acceptance of responsibility statement, the government believes that she is remorseful for her crime. PSR ¶ 75.

Ultimately, this Court must enter a sentence that promotes respect for the law, provides just punishment for the offense, and avoids unwarranted sentencing disparities. To that end, the government is respectfully recommending a sentence at or near the 22 months this court imposed on co-defendant Natchanok Yuvasuta. Such a sentence will be no greater than necessary to achieve the goals of sentencing.

Dated:   December 16, 2019                    Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

*s/ Laura M. Provinzino*

BY: Laura M. Provinzino
Attorney ID No. 0329691
Melinda A. Williams
Attorney ID No. 491005DC
Assistant United States Attorneys

U.S. Attorney's Office
300 South Fourth Avenue, Suite 600
Minneapolis, MN  55415
612-664-5600